**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DISTRICT**

| | |
|---|---|
| **THOMAS DAWSON** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 11 C 6671** |
| **v.** ) | |
| ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN,**[1] **Commissioner of** ) | |
| **Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Thomas Dawson, seeks judicial review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration, made on June 10, 2010, denying his application for Supplemental Security Income ("SSI") under Title XVI, Section 1382(a)(3)(A) of the Social Security Act ("Act"). Mr. Dawson asks this court to reverse and remand the Commissioner's decision. The Commissioner seeks an order affirming the administrative law judge's decision.

**I.**

**PROCEDURAL HISTORY**

Mr. Dawson filed an application for Supplemental Security Income on August 29, 2007, alleging disability beginning June 30, 1998, due to hearing voices and being unable to concentrate. (R. 13, 148-49). Mr. Dawson's application was initially denied on November 29, 2007, and upon reconsideration on June 12, 2008. *Id.* Thereafter, Mr. Dawson filed a written request for hearing before an administrative law judge ("ALJ") on August 16, 2008 (20 CFR §§

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

416.1429 *et seq.*). *Id.* Mr. Dawson appeared and testified at a hearing held on March 22, 2010, in Chicago, Illinois. *Id.* In addition, Ms. Glee Ann L. Kehr, an impartial vocational expert, also appeared at the hearing. *Id.* On June 10, 2010, the ALJ issued a decision denying Mr. Dawson's disability claim. (R. 13-23). The ALJ found that the Mr. Dawson was not under a "disability" within the meaning of the Act, at any time through the date of the decision, because he has the residual function capacity to perform medium work as defined in 20 CFR §§ 416.967(c) with limitations. There exist a significant number of jobs in the national economy for which Mr. Dawson qualifies. (R. 22). Mr. Dawson then requested review by the Appeals Council, which was denied on August 25, 2011. (R. 1-4).

Mr. Dawson seeks judicial review of defendant's denial of his disability claim. This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). On October 31, 2011, both parties consented in writing to proceed before a Magistrate Judge pursuant to 28 U.S.C. §§ 636(c).

## I. THE EVIDENCE OF RECORD

### A. The Vocational Evidence

Mr. Dawson was born on February 5, 1963, making him 44 years old at the time of the ALJ's decision. (R. 21). He is either not married, or married but separated – his story on that, like several other things, varies. (R. 37, 217, 264). He claims to have no minor children, and says he lives with his aunt. (R. 18). He has an 8th or 10th or 11th grade education – again the story varies – and depending on whom he is talking to, Mr. Dawson may or may not have taken special education courses while in school. (R. 152, 217, 264).

Mr. Dawson has no past relevant work experience. (R. 142). The only job he has held in the past 15 years was briefly as a day laborer in 1989 (R. 149) but stopped working altogether after that. He could not say why, as he claimed not to be disabled until about ten years later. (R.

149). He has been in prison twice and perhaps that had something to do with it. (R. 50). Most recently, he was convicted of possession and sale of a controlled substance and was incarcerated for 18 months. (R. 216). He had been receiving disability benefits at the time but those were terminated due to his conviction and imprisonment. (R. 17, 34-35). He claimed he did not even know what his disability was that garnered him those benefits. (R. 35). Yet, once Mr. Dawson was released from prison, in August of 2007, he had no problem coming up with a claim for disability and immediately applied for benefits on August 27, 2007.

**B.      The Medical Evidence**

At a prison evaluation in June 2006, it was noted that Mr. Dawson had an adjustment disorder that was stable and a history of drug abuse, especially heroin. (R. 203, 209). Exam was essentially normal, and Mr. Dawson denied having delusions or hearing voices. (R. 203). He was noted to be cooperative. (R. 203). His Global Assessment of Functioning Score was 70, (R. 203), meaning he had only "some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." http://www.gafscore.com/. Mr. Dawson's prison exams all indicated that his mental status was normal, and he was a cooperative patient. (R. 208, 211). He was given Trazadone. (R. 203, 211).

Once he was out of prison for a month and after he applied for benefits, Mr. Dawson underwent a consultative psychiatric examination as part of the process and performed by Ana A. Gil, M.D. on September 20, 2007. (R. 216-219). In this evaluation, Mr. Dawson, lied about his history of drug abuse. (R. 216). He said he was married, but separated. He explained that he lived with his aunt, but did his own cooking and helped grocery shopping and laundry. (R. 217). He also denied having any "visual or tactile hallucinations or feelings that people want to hurt

him or want to harm him" to Dr. Gil. (R. 217). Dr. Gil reported that he was "[w]ithout suicidal or homicidal ideation, intent or plan, auditory, visual or tactile hallucinations, paranoid ideation or delusions. (R. 218). Dr. Gil described Mr. Dawson as uncooperative and reticent to answer questions, but diagnosed him with: 1) Antisocial Personality Disorder, 2) Schizoid Personality Traits, 3) Borderline Intellectual Functioning, 4) History of a Reading and Arithmetic Learning Disability. (R. 219).

On October 10, 2007, R. Leon Jackson, Ph.D., reviewed the medical file on behalf of the disability agency. (R. 220). He found there was "no evidence to support the presence of clamant being psychotic, or for hearing voices." (R. 232). Dr. Jackson found that Mr. Dawson had moderate limitations in daily activities and mild limitations in social functioning and maintaining concentration. (R. 230).

On October 14, 2007, Mr. Dawson was admitted to Mercy Hospital Emergency Room for a 5 centimeter laceration to his right heel sustained when he was pushed out of a car by his companions. (R. 235). He had been using marijuana. (R. 235). There was no fracture, dislocation, or swelling. (R. 234-35). The only pain Mr. Dawson had was right at the laceration location. (R. 235). Mr. Dawson denied any history of depression or psychiatric treatment. (R. 235).

On November 6, 2007, Mr. Dawson had a consultative medical evaluation in connection with his application for benefits. Dr. Fauzia A. Rana noted that his chief complaint was pain in his right ankle and foot. (R. 244-246). Upon examination, Dr. Rana noted the laceration, as well as moderate swelling. (R. 246). Mr. Dawson could not move the ankle, but had a full range of motion in all other joints. (R. 246). Dr. Rana described him as irritable. (R. 244). Dr. Rana noted that Mr. Dawson limped when he walked and used a crutch. *Id.* The doctor reported that

he had a prosthetic right eye, as a result of an injury to sustained in a car accident 10 years earlier. *Id.* Similar to Dr. Gil, Dr. Rana said Mr. Dawson was "not very cooperative," and "seem[ed] disinterested and somewhat reluctant to follow instructions." (R. 245). Although Mr. Dawson had claimed asthma caused him difficulty breathing every day, there was no evidence of this upon examination. Contrary to what he had told the emergency room doctors just three weeks earlier, Mr. Dawson claimed that he had a history of psychiatric treatment including a hospitalization two years earlier. (R. 244). Dr. Rana's diagnostic impression has four findings: 1) Degenerative Arthritis – right ankle has not yet healed from car accident; ankle is swollen and claimant cannot move without help of a crutch, 2) Bronchial asthma, 3) Prosthetic right eye – notes though that claimant had no difficulty walking through the clinic, and 4) Depression with drug abuse in the past. (R. 246).

Dr. Jackson reviewed the record a second time in November 2007. (R. 253). He felt that Mr. Dawson was moderately limited in the ability to understand and remember instructions, carry out detailed instructions, maintain concentration for extended periods, perform activities within a schedule and maintain regular attendance, and complete a workday and workweek without interruptions from psychological symptoms. (R. 251-52). He had no other significant limitations.

Dr. Frank Jimenez, also reviewed the record on November 27, 2007. (R. 262). He noted that the claimant is still walking with a crutch and limping. *Id.* However, Dr. Jimenez concluded that "After recovery from foot injury, claimant should not have any significant exertional or postural limitations." *Id.* He found that Mr. Dawson had no limitations on his ability to lift and carry, or to sit stand or walk. (R. 256). He had to avoid fumes and odors. (R. 259).

Mr. Dawson had another consultative psychiatric evaluation on March 31, 2008, this one by Dr. Helena M. Radomska. (R. 263). Mr. Dawson said he took several medications, including Prozac, Xanax, Elavil, and Trazadone. (R. 263). He contradicted earlier statements and said he had never been married. (R. 264). Regarding his appetite, he claimed he didn't eat, but denied any weight loss. (R. 263). He said he didn't cook or clean, contrary to earlier statements. (R. 264). At this examination, he claimed to hear voices which told him "he should kill people and hurt people." (R. 264). He also claimed not to have used marijuana or other street drugs since the 1990s, contrary to the emergency room report six months earlier and his prison medical records. (R. 264). He said he was twelve years old. (R. 265). He denied auditory, visual or tactile delusions, although he alleged to have heard voices all throughout the interview, reporting that the voices were saying somebody is coming. (R. 265). Dr. Radomska noted that Mr. Dawson was not oriented to time and place, claimed not to know his age, and could not repeat even 4 digits forward. (R. 266). Dr. Radomska diagnosed the claimant with psychosis or schizophrenia. His GAF was 40 to 45, meaning he had "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." http://www.gafscore.com/.

Michael J. Schneider, Ph.D., reviewed the record on May 02, 2008. (R. 267). He felt Mr. Dawson did not have a severe impairment. (R. 267). He opined that Mr. Dawson had no more than mild limitations in daily activities, social functioning, and maintaining concentration. (R. 277). Dr. Schneider noted in his review that Mr. Dawson's "credibility is questionable, as his stories change." *Id.* Dr. Schneider goes on, noting that claimant's presentation in consultative exam was "dramatically different from earlier consultative exam and inconsistent with prior history." *Id.* Dr. Schneider reasoned that, "given claimant's questionable credibility, antisocial

personality, and criminal history, his performance in the March 31 consultative exam seems manufactured and not genuine." *Id.* Ultimately, he concluded that the presence of a severe mental impairment was not substantiated. *Id.*

David Hillman, M.D. performed an Ophthalmology Consultative Exam on the claimant on May 16, 2008. (R. 281). Dr. Hillman did an ocular examination and found that he had refractive error, but was unable to accurately ascertain how poor Mr. Dawson's vision truly is. *Id.* Dr. Hillman was unable to accurately reach a diagnosis due to cooperation and somnolence issues, noting that he "did not feel that the moderately decreased best corrected visual acuity or the very decreased visual field readings [were] consistent with the exam." *Id.* Dr. Hillman did note however, that the claim, "ambulated through the hallway and examining room in normal fashion."

## C.  The Administrative Hearing Testimony

## 1.   Mr. Dawson's Testimony

Mr. Dawson testified that he does not have and has never had a driver's license. (R. 32). He claimed to be married – contrary to what he had told Dr. Radomska – but did not know where his wife was (R. 37).  He had no minor children and lived with his aunt, who does most of the cooking and cleaning.  (R. 37).  He claimed his aunt didn't allow him to cook because he leaves the stove on. (R. 46).  He said he swept and mopped the floor at his aunt's house. (R. 49). He has never lived alone. (R. 43). He spent most of the day sitting around watching TV. (R. 38).  He completed the eleventh grade of school. (R 32)*.*

Mr. Dawson couldn't remember the last time he worked, but it was a very long time ago. (R. 34). He testified that he had previously received disability benefits but they were terminated when he was incarcerated. *Id.* He stated that he was incarcerated for sixteen months for

possession of drugs. (R. 35). He further testified that he has been arrested approximately five or six times and had been in prison a couple of times. (R. 50).

Mr. Dawson testified that he has trouble seeing and has lost vision in his right eye. (R. 36). He has pins in his left knee. (R. 39). He said he gets tired from walking, and cannot normally lift because he has a bad back. (R. 40). He stated that he can lift about ten pounds and walk about two or three blocks. (R. 41). He did not have any problems sitting and can stand for fifteen-twenty minutes. *Id.* Mr. Dawson testified that he hears voices four or five days out of the week. (R. 49). He claimed he was not seeing a doctor or psychiatrist because he could not afford it. (R. 50).

## 2. The Vocational Expert's Testimony

The vocational expert, Ms. Glee Ann L. Kehr, testified that the Mr. Dawson had no prior work history. (R. 51). The ALJ posited the following hypothetical to the vocational expert during testimony:

> I would have you assume an individual in the younger age category with a limited education and no past relevant work experience as reflected in Exhibit 5D, and assuming further that the claimant could life and carry up to 50 pounds occasionally and 25 pounds frequently, can be on his feet standing and walking about six hours in an eight hour workday, has loss of vision in his right eye, should not be exposed to moving or dangerous machinery and should avoid heights and climbing ladders. From a mental standpoint, he has a moderate inability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods 10% of the time and perform activities within a schedule and maintain regular attendance and be punctual within the customarily tolerances as well as to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform on a consistent base without an unusual, unreasonable number and length of rest periods, both of these at 10% of the time. (R. 52-53).

The ALJ then asked the vocational expert, "in view of the fact that claimant has no past relevant work, and we're not considering returning to past relevant work, would other work be feasible?" (R. 53). The vocational expert testified that the ALJ's hypothetical outlines medium

unskilled work. *Id.* She provided some appropriate positions such as laundry worker, of which approximately 5,700 positions exist, janitor, of which approximately 5,300 positions exist, and kitchen helper of which approximately 4,900 positions exist. *Id.* The vocational expert posited that these are all SVP 2, unskilled jobs. *Id.* The ALJ then adapted his hypothetical, asking if the claimant were only able to lift and carry 10 pounds occasionally, could walk no more than two to three blocks at a time, stand no more than 15 to 20 minutes at a time, with the other aforementioned restrictions, would these jobs be feasible? (R. 54). The vocational expert testified that the types of positions available for this hypothetical would be sedentary, unskilled work. *Id.* Some examples of such work are: account clerk, of which approximately 3,800 positions exist, telephone clerk, of which approximately 4,700 positions exist, and order clerk, of which approximately 8,800 positions exist. *Id.* On examination by claimant's attorney, the vocational expert noted that if one is off task more than 15% of the day, it would preclude jobs (R. 55).

## III. THE ALJ'S DECISION

The ALJ concluded that the claimant has not been under a disability within the meaning of the Social Security Act from August 29, 2007 through the date of the decision. (R. 22). The ALJ found that the claimant had the following severe impairments: loss of vision in the right eye and a personality disorder. (R. 15). Those impairments impose more than a minimal restriction on his ability to perform basic work activities. *Id.* However, the ALJ determined that Mr. Dawson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* The ALJ stated that the medical evidence did not demonstrate that Mr. Dawson's impairments rose to that

level of severity, as they did not meet or medically equal the criteria of listings 12.08 and 12.09. *Id.*

The ALJ found that in activities of daily living, Mr. Dawson had mild restrictions. (R. 16). In social functioning, he similarly had mild difficulties. *Id.* ALJ noted that, although he was diagnosed with antisocial personality disorder, schizoid traits, Mr. Dawson was not cooperative during examinations. *Id.* Similarly, in terms of claimant's alleged visual impairment, claimant's best corrected vision in his left eye measured 20/60 and 20/200 with pinhole, yet, again, he displayed very poor cooperation during the examination. *Id.* The ALJ stated that he "does not rely on the validity of these test results and relies on the opinion of [the examiners] that the results were negatively influenced by the claimant's lack of cooperation." *Id.* The ALJ went on to say that, after careful consideration of the evidence, he found that the claimant's medically determinable impairments could reasonably be expected to cause the claimant's alleged symptoms, "however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual function capacity." (R. 20).

Upon careful consideration of the entire record, the ALJ found that the claimant has retained the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) in that he could lift and carry 50 pounds occasionally and 25 pounds frequently; he could be on his feet standing/walking about 6 hours of an 8-hour workday and sit for about 6 hours of an 8-hour workday; he had loss of vision in the right eye and should not be exposed to moving or dangerous machinery, and avoid heights and climbing ladders; from a mental standpoint he has a moderate inability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods (10% of the time),

perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances (10% of the time), complete a normal workday and workweek without interruptions based on symptoms, and perform at a consistent pace without an unreasonable number of length and rest periods (10% of time). (R. 17).

In making this finding, the ALJ considered all symptoms and the extent to which these symptoms can be accepted as consisted with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SIRS 96-4p and 96-7p. Id.

The ALJ found that Mr. Dawson had no relevant past work experience. (R. 21). However, considering his age, education, work experience, and residual function capacity, there existed a significant number of jobs in the regional economy that the claimant can perform. *Id.* Relying on the vocational expert's testimony, examples of jobs he could perform included: laundry worker (5,700 jobs), janitor (5,300) and kitchen helper (4,900). (R. 22). All of those jobs are unskilled, at the medium level of exertion and had an SVP 2. *Id.* The ALJ added that even if Mr. Dawson could only perform light work, there were still thousands of jobs he could do in the local economy. (R. 22). Upon reaching this conclusion, the ALJ found that the claimant was not under a disability within the meaning of the Social Security Act. *Id.*

## IV. ANALYSIS

### A. The Standard of Review

We review the ALJ's decision deferentially and will not replace the ALJ's judgment with our own. *Weathered v. Astrue*, 649 F.3d 565, 568 (7th Cir.2011). Our analysis focuses on whether the ALJ's determination was supported by substantial evidence, comprising such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Pepper v. Calvin*, 712 F.3d 351, 361 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

In rendering a decision, an ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005). It is enough if the ALJ "minimally articulate[s] his or her justification for rejecting or accepting scientific evidence of disability." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). The Seventh Circuit has repeatedly assured that the standard is a "lax" one. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008).

**B. The Five-Step Sequential Analysis**

Section 423(d)(1) of the Act defines disability as an "inability to engage in any substantial gainful activity be reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential analysis to determine whether a Mr. Dawson is disabled:

> 1) is the Mr. Dawson currently unemployed;
>
> 2) does the Mr. Dawson have a severe impairment;
>
> 3) does the Mr. Dawson have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the Mr. Dawson unable to perform his past relevant work; and
>
> 5) is the Mr. Dawson unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512–13 (7th Cir.2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir.2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step 3, stops the

inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir.1990). The claimant bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee*, 649 F.3d at 569–70; *Briscoe*, 425 F.3d at 352.

### C. Analysis

Mr. Dawson presents four criticisms of the ALJ's decision: 1) The ALJ failed to properly address Dr. Radomska's report, 2) the ALJ failed to properly analyze the opinion of Mr. Dawson's treating physician, contrary to 20 C.F.R. § 416.927(d), 3) the ALJ failed to make a proper credibility determination contrary to SSR-96-7p, and 4) the ALJ's residual function capacity assessment is insufficient as a matter of law.

### 1.

An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009). But an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir.2008). "An ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). "The more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(4).

Mr. Dawson argues that the ALJ failed to analyze Dr. Radomska's report conducted in March 2008 and as such, the ALJ's mental RFC assessment is deficient. But, the ALJ explicitly addressed Dr. Radomska's consultative report, noting that it was in direct contrast to the consultative report of Dr. Gil in Exhibit 2F. (R. 18). This, of course, is a perfectly acceptable reason to reject a physician's opinion. *Givens v. Colvin*, – F.3d –, –, 2013 WL 6623179, 6 (7th Cir. 2013)("An ALJ may discount even a treating physician's opinion if it is inconsistent with the medical record."); *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). Moreover, the ALJ went on to emphasize that, "the conclusions and evaluations that find that the claimant is unable to interact appropriately and that the claimant suffers from schizophrenia or a personality disorder is based on the claimant's subjective reports and allegations." (R. 18). The ALJ expounded upon this reasoning, explaining that "in determining a mental impairment, a conclusion is based on information gathered over an extended period of time and from other sources." (R. 18). In essence, the ALJ is saying that one report is not determinative, and he must consider the evidence as a whole. *See Schmidt*, 496 F.3d at 854 (noting that an ALJ is not required to rely entirely on one physician's report). Taking the medical evidence in its entirety, the ALJ concluded that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15).

It is unclear what more Mr. Dawson wants the ALJ to do with Dr. Radomska's report. It is, after all, not entitled to conclusive weight. It is simply one part of the evidence that must be assessed in the context of all the rest of the evidence. Mr. Dawson, as the ALJ concluded, lied during the examination – about his marriage, about eating, etc. – and judging from prior

examinations, clearly exaggerated – about being twelve years old and hearing voices telling him to kill people.  Obviously, people who say the kinds of things that he said are either lying because it suits their purpose, or have some mental impairment. Determining which cannot be decided in the abstract but only in the context of the entire case.

In this case, when there was no motive for Mr. Dawson to fabricate – that is when he was not trying to get benefits – his stories about himself and his surroundings appeared perfectly normal and were consonant with reality. He was cooperative and was found to have only mild symptoms and able to function generally well. (R. 203). It was only in the context of the administrative proceedings where it served his purpose to tell wild and incongruent stories that he did so. Applicants for disability benefits have an obvious incentive to exaggerate their symptoms and tell a story that maximizes their chance of success. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). *Compare Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir. 2009)(every judge is aware that many people who do not have a criminal record will lie in a trial when it is to their advantage).

Mr. Dawson argues the ALJ had to consider the report and indicate the weight he attributed it.  (*Plaintiff's Memorandum*, at 6).  The ALJ clearly did both of these things. As the ALJ explained, he found Dr. Radomska's report (Exhibit 8F) to be in stark contrast to Dr. Gil's report. (Exhibit 2F). He concluded that it lacked reliability. The suspicion was, and is, that Mr. Dawson faked it during the examination.  After all, as the ALJ commented, he could be cooperative when it behooved him to do so (R.  18, 21).  More on that later.

Mr. Dawson also has a problem with the ALJ's failure to give controlling or great weight to the opinion of Dr. DeLosSantos (R. 300-301), whom he says was his treating physician.  The ALJ gave great weight to Dr. DeLosSantos' conclusion that Mr. Dawson had no physical

limitations – Dr. DeLosSantos had seen him for complaints about a sore back and an STD. But, the ALJ gave little weight to the doctor's opinion that Mr. Dawson had significant limitations in concentration and memory. (R. 20). The ALJ said there was no evidence to support the limitations the doctor found. (R. 20).

A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir.2004). The ALJ was not required to give Dr. DeLosSantos's opinion controlling weight, *see Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008); *Skarbek,* 390 F.3d at 503, but he was required to provide a sound explanation for his decision to reject it. See 20 C.F.R. § 404.1527(c)(2); *Roddy*, 705 F.3d at 637; *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). The ALJ adequately did that here.

The Social Security Administration requested medical records from Dr. DeLosSantos regarding any physical or mental impairments Mr. Dawson might have. The office specified certain areas of focus – like lifting, carrying, concentrating – and told the doctor if he did not have any such records he should phone the adjudicator. (R. 300). Dr. DeLosSantos didn't supply any records of treatment, but merely returned the letter, jotting on it that Mr. Dawson had no physical limitations but had significant limitations in concentration and understanding and memory. The doctor added that he was always argumentative and loud. (R. 300).

It is well-settled that if a physician's opinion – even that of a treating physician – has no medical support, an ALJ can properly reject it or assign it little or no weight. *Givens v. Colvin*, – F.3d –, –, 2013 WL 6623179, 6 (7th Cir. 2013)(ALJ properly rejected report that cited no medical evidence); *Skarbek v. Barnhart,* 390 F.3d 500, 503–04 (7th Cir.2004)(ALJ properly rejected

report that failed to identify medical evidence supporting it). The "opinion" Dr. DeLosSantos supplied was utterly conclusory and thus of no value. It was nothing more than a "bottom line," and Dr. DeLosSantos either wouldn't or couldn't supply any underlying evidence to support it. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). As the Supreme Court and the Seventh Circuit have stressed, *ipse dixits* are never enough. *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *United States v. Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). *See also Cunningham v. Masterwear Corp.*, 569 F.3d 673, 674–75 (7th Cir. 2009)(physician had to present evidence to support his opinion); *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.), *cert. denied*, 512 U.S. 1222 (1994)(physician's opinion was unreliable where it was unsupported by anything to justify his conclusion).

Mr. Dawson maintains that the factors listed under 20 CFR §416.927(d), especially length and frequency of treatment, nature and extent of treatment, and area of specialization, dictate that the ALJ should have accorded great weight to Dr. DeLosSantos's opinion. (*Plaintiff's Memorandum*, at 7-8). Mr. Dawson ignores one of the factors – supportability – perhaps because it does not help his case. Under 20 CFR §416.927(d)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory finding, the more weight we will give that opinion." Dr. DeLosSantos presented *no evidence whatsoever* to support his opinion.

As for the other factors, the report indicates that Dr. DeLosSantos did not see Mr. Lawson in 2007 and had seen him only once since then, when he complained of a sore back and exposure to an STD. So there is virtually *no* treating relationship to give Dr. DeLosSantos's report any "longitudinal" weight. As for specialization, Dr. DeLosSantos is not a psychiatrist and, again, treated Mr. Dawson for a sore back and an STD. That is a matter of significance as

Judge Posner explained in *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995). There, the Court emphasized that a physician, as opposed to a psychiatrist, was not necessarily competent to assess mental impairments. It was therefore permissible for the ALJ to reject Dr. DeLosSantos cursory and conclusory jottings.

## 2.

Mr. Dawson next finds fault with the ALJ's determination that he was not a credible witness. Given the record, it would give one pause if the ALJ *had* found Mr. Dawson credible. The ALJ based this credibility finding on several factors, first among which was the fact that "the record is replete with inconsistent statements regarding [Mr. Dawson's] mental impairments" and "cut against [his] credibility." (R. 19). That's putting it lightly.

Mr. Dawson's story was a mass of contradictions. Sometimes he was never married, sometimes he was married but separated. Sometimes he had an 8th grade education, sometimes he finished the 10th grade, and sometimes the 11th. Sometimes he had special education classes, sometimes not. But his various stories didn't merely touch on the peripheries. When he applied for benefits, he asserted that he had never been treated for a mental impairment. (R. 151). As the ALJ noted (R. 19), this story changed as the application process progressed. He claimed he had been hospitalized for a mental impairment. (R. 244). And while he denied hearing voices to the doctors in prison and to Dr. Gil (R. 203, 217, 218), when the application process was coming to a close, just a few months later he told Dr. Radomska that he heard voices so much he couldn't concentrate and they told him to kill people. (R. 264).

The ALJ could certainly find Mr. Dawson not credible in view of his casual disregard for the truth that is demonstrated throughout the record. *See Hamilton v. Colvin,* 525 Fed.Appx. 437 (7th Cir.2013)("Testimonial inconsistencies can indeed form the basis of an adverse credibility

finding . . ." (citing SSR 96–7p)); *Wurst v. Colvin,* 520 Fed.Appx. 485, 488 (7th Cir.2013)("Of course, lies and inconsistent statements provide a valid basis for finding a witness not credible."); *Champion v. Chater*, 1995 WL 447982, 5 (7th Cir. 1995)("conflicting statements clearly go to the claimant's veracity, and the ALJ may properly consider them in assessing credibility.").

It is important to recall the repeated cautions of the Seventh Circuit that when determining the sufficiency of the credibility determination, a reviewing court must give the ALJ's determination "special deference," *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir.2010); *Briscoe ex rel. Taylor,* 425 F.3d at 354, because the ALJ, not the reviewing court, was in the best position to evaluate credibility, having had the opportunity to observe the plaintiff testifying during the hearing. *See Castile v. Astrue,* 617 F.3d 923, 928–29 (7th Cir.2010); *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). Even minor discrepancies – and here they were major, to say the least – coupled with the ALJ's observations of a claimant during the hearing, is sufficient to support an ALJ's finding that a claimant was not credible. *See Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000) (holding that the hearing officer's evaluation of mildly inconsistent testimony, coupled with his observations of the claimant at trial, is sufficient to avoid remand under the "patently wrong" standard); *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). Justice Jackson perhaps said it best: "A few minutes' observation of the parties in the courtroom is more informing than reams of cold record." *Ashcroft v. Tennessee,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting).

The other reason the ALJ gave for doubting Mr. Dawson's veracity was his consistent lack of cooperation with consultative examinations. (R. 19-20). The only time Mr. Dawson was cooperative with a mental health care professional was when he was in prison. Notably, those

exams were normal, and he was assessed as having no more than mild symptoms and being able to function generally well. When the exams were hoops he had to jump through to get benefits, things changed. He was consistently uncooperative and reluctant to answer questions. Even at his eye exam, the doctor felt he "tanked" it. The rather rapid sea change in Mr. Dawson's behavior with prison doctors to doctors examining him in connection with his application for disability benefits, and the fact that he was cooperative the ALJ at the hearing – the man deciding whether he'd get paid – certainly allowed the ALJ to find that Mr. Dawson simply chose to be uncooperative during the process. (R. 21).

Significantly, the Seventh Circuit has held that "a claimant's failure to cooperate may be sufficient reason *in itself* to reject h[is] testimony." *Goble v. Astrue*, 385 Fed.Appx. 588, 591-92 (7th Cir. 2010)(emphasis supplied); *see also Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002) (explaining that ALJ was free to conclude that claimant's lack of cooperation during evaluations of her physical capacity undermined the credibility of her complaints of pain); *Harrelson v. Astrue*, 273 Fed.Appx. 632, 634 (9th Cir. 2008)(fact that claimant was uncooperative at psychological exam was "clear and convincing" for finding her not credible); *Siebert v. Commissioner of Social Security*, 105 Fed.Appx. 744, 747(6th Cir.2004)(differing answers and lack of effort at exams undermined claimant's credibility).

Judge Posner addressed claimants like Mr. Dawson twenty five years ago – coincidentally, around the last time Mr. Dawson attempted to work – in *Pearce v. Sullivan*, 871 F.2d 61 (7th Cir. 1989). Writing the opinion for a unanimous panel, he said:

> [claimant] has himself to blame for being denied social security disability benefits, assuming he actually is totally disabled. He wanted the government to pay him a substantial income for life, and as a precondition—the validity of which he does not question—the government wanted him to submit to a simple

> examination by a reputable physician at the government's expense to prove that his impairment was so serious that it prevented him from doing any gainful work. A prickly temperament is not an asset in seeking benefits; as a result of [claimant's] refusal to cooperate, he failed to obtain the test results that he needed to establish his disability. A severe impairment is a necessary rather than sufficient condition for an award of disability benefits. A severely impaired individual is not disabled within the meaning of the statute and implementing regulations if he retains sufficient residual capacity to do gainful work. The examination in which [claimant] refused to cooperate was intended to determine whether he had such residual capacity.

871 F.2d at 64 (7th Cir. 1989). This should be a cautionary tale for claimants and the counsel that choose to take their cases to federal court.

Between Mr. Dawson's lies, conflicting testimony, and uncooperative behavior during every consultative examination, the ALJ had ample reason to find him not credible. Ignoring these reasons and the caselaw applicable to them[2], Mr. Dawson complains that the ALJ improperly rejected his description of his daily activities because they could not be objectively verified and the medical evidence of limitations was weak.[3] (*Plaintiff's Memorandum*, at 18). But, given the rest of the ALJ's credibility assessment, this is no more than nitpicking. *See Burnam v. Colvin*, 525 Fed.Appx. 461, 464 (7th Cir. 2013); *Castile v. Astrue*, 617 F.3d 923, 929

---

[2] Mr. Dawson also ignores caselaw that states that the ALJ's use of "boilerplate" in his credibility finding is of no concern where the ALJ also gives reasons from his determination. *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir.2013); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir.2012). The ALJ clearly gave reasons here – Mr. Dawson acknowledges as much – so the argument has no place in Mr. Dawson's brief. Wedging it in where it does not belong is a tedious habit of Mr. Dawson's counsel. *See, e.g.*, *Triplett v. Colvin*, 2013 WL 6169562, 8 (N.D.Ill. 2013); *Orienti v. Astrue*, 2013 WL 4008719, *12–13 (N.D.Ill.2013); *Patton v. Colvin*, 2013 WL 4024506, *3 n.3 (N.D.Ill.2013). Canned briefs may save time and money, but Mr. Schultz would do well to check the can's ingredients before rolling them out of the cannery.

[3] Mr. Dawson's accounts of his daily activities cannot even be *subjectively* verified. He has stated, variously, that he does his own cooking and helps with grocery shopping and laundry (R. 217), he has stated that he does absolutely nothing (R. 264), and that his aunt does "most" of the chores. (R. 37).

(7th Cir.2010); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000). The ALJ's credibility assessment need not be perfect; it just can't be patently wrong. *Schreiber v. Colvin*, 519 Fed.Appx. 951, 961 (7th Cir. 2013)("We agree that the ALJ's discussion regarding [claimant's] activities of daily living was not ideal in this regard . . . [but] it was also not patently wrong."); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012)("Despite [some] shortcomings, the ALJ adequately evaluated [claimant's] credibility, and we see no reason to reverse."); *Kittelson v. Astrue,* 362 Fed.Appx. 553, 557 (7th Cir.2010) ("The ALJ's adverse credibility finding was not perfect. But it was also not 'patently wrong.' "). Mr. Dawson has not come close to showing the ALJ's determination that he was not credible was patently wrong.

### 3.

Finally, Mr. Dawson complains that the ALJ had "no medical basis" for finding that his various moderate limitations – concentration, performing activities on schedule, completing a normal workday and week – would affect him 10% of the time. (*Plaintiff's Memorandum*, at 14-15). As Mr. Dawson concedes in his reply brief, however, the ALJ based his finding that Mr. Dawson had only moderate limitations in a few areas on the report of the state agency reviewing doctor, Dr. Jackson. (R. 20)(*Plaintiff's Reply*, at 8). But Mr. Dawson remains concerned with how the ALJ got from "moderate" restrictions to his 10 percent figure. He argues that there is no numerical value associated with a moderate limitation. (*Plaintiff's Memorandum*, at 14). It's an odd argument to make, especially seeing as Mr. Dawson's counsel had no qualms about positing a 15 percent figure as being supported by a more severe, *marked* limitation. (R. 55, 58). If a marked limitation – which is defined only as "more than moderate but less than extreme," 20 CFR Pt. 404, Subpt. P, App. 1, 12.00(C); *see also Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013) – is approximated in the eyes of Mr. Dawson's counsel by a 15 percent reduction, why

would that not allow for the less severe limitation to be approximated by a 10 percent reduction? Mr. Dawson cannot say.

As the VE testified in this case, the limit for being off-task at work and still being able to hold down a job is no more than 10 to 15 percent. (R. 55). This is a commonly accepted benchmark in the world of determining whether someone can work despite a certain degree of limitation on abilities like concentration. *See, e.g.*, *Burnam v. Colvin*, 525 Fed.Appx. 461, 463 (7th Cir. 2013); *Groberg v. Astrue*, 415 Fed.Appx. 65, 73 (10th Cir. 2011); *Anthony v. Astrue*, 266 Fed.Appx. 451, 455 (6th Cir. 2008). Dr. Jackson, after reviewing the medical evidence, found that Mr. Dawson was moderately limited in three areas: understanding detailed instructions, carrying out detailed instructions, concentrating for extended periods, performing activities within a schedule and maintaining attendance. (R. 251). These moderate limitations, Dr. Jackson explained, did not prevent Mr. Dawson from engaging in "simple and routine tasks." (R. 253). That meant that Mr. Dawson's limitations did not rise above the 10 to 15 percent vocational cut off for being able to hold down a job.

And so, in translating Dr. Jackson's findings into an RFC and a hypothetical for the VE, the ALJ employed the 10 percent figure. Given Seventh Circuit precedent, it would have been risky business indeed for the ALJ to have simply echoed Dr. Jackson and asked the VE to consider a limitation to "simple, routine tasks. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). An ALJ is not always allowed to do so, and it is not a "simple, routine task," to determine which circumstance allow it and which do not. *See O'Connor-Spinner*, 627 F.3d at 620 (parsing cases); *Kusilek v. Barnhart,* 175 Fed.Appx. 68, 71 (7th Cir. 2006)("there is uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations."). Therefore, the ALJ chose to translate Dr. Jackson's findings into terms the VE

could work with; terms that the Seventh Circuit has not rejected and that plaintiff's counsel employed as well. Based on the ALJ's adequate translation of Dr. Jackson's findings, the VE testified that there were a significant number of jobs Mr. Dawson could perform.

Still, Mr. Dawson contends that this 10 percent reduction of Mr. Dawson's ability to maintain regular attendance would mean that he would miss about 2 days of work each month. (*Plaintiff's Memorandum*, at 15). He points out that the VE testified that "generally an individual can't miss more than . . . one day a month." (R. 56). But the ALJ didn't find that Mr. Dawson would miss work 10 percent of the time. He found – and posited to the VE – that Mr. Dawson had a 10 percent reduction in the ability "to perform activities within a scheduled [sic] and maintain regular attendance and be punctual within the customarily [sic] tolerances . . . ." (R. 53). A 10 percent reduction in that *overall* ability doesn't mean that the person is necessarily going be missing one out of every ten days of work. The reduction might at times affect punctuality, while at other times it might affect performing scheduled activities. That is why the VE testified that a person with such a limitation could hold down a job, while a person who regularly missed one day of work every month could not.


**4.**


Like the plaintiff in *Pearce*, Mr. Dawson wants all those who pay into the Social Security system to pay him a substantial income for life. He, too, brought an uncooperative attitude to the consultative examinations that were a part of the application process. He also lied throughout. Both tactics might have served him well, as he was claiming he was disabled by mental impairment. *See Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006)("Applicants for disability benefits have an incentive to exaggerate their symptoms, . . . ."); *Young v. Barnhart*,

362 F.3d 995, 1001 (7th Cir. 2004)(it was not improper to note that plaintiff had an incentive not to do well on a mental status exam). Prior to applying for benefits, when there was no financial incentive, Mr. Dawson didn't hear voices telling him to kill people, didn't claim to be twelve years old, and was a cooperative patient. The ALJ picked up on what was going on and properly rejected Mr. Dawson's claim. The ALJ's decision might not have been perfect, but it didn't have to be. *Schreiber v. Colvin*, 519 Fed.Appx. 951, 962 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see also Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). It was supported by substantial evidence and articulated adequately to allow for meaningful review. Nothing more is required.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 4/10/14